Good afternoon. Illinois Appellate Court vs. Fisher Court is now in session. The Sixth Division, the Honorable Justice Michael B. Hyman presiding, case number 23-0246, Inouye, the Commitment of Edward Gavin. Good afternoon. My name is Justice Michael Hyman. With me is Justice Carl Walker and Justice Sanjay Taylor. We're going to conduct this as if we were in the courtroom. Each side will have 20 minutes. Appellant can reserve time for rebuttal. So if you would first introduce yourselves. And Mr. Johnson, how much time you wish for rebuttal? Good afternoon. Michael Johnson on behalf of the appellant. I'd like to reserve three minutes for rebuttal. Okay. Good afternoon. Assistant Attorney General Matt Skiba on behalf of the people. Thank you very much. Any questions before we begin? If not, Mr. Johnson. Thank you. And before I begin, I don't have a question, but I do wish to make a correction, which is that on page two of our reply brief, I mistakenly identified the judge presiding over the motions in limine as Judge Clancy, when in fact the record reflects that it was Judge Walton. And I apologize for that mistake. Thank you for correcting me. Sexually violent person cases require the fact finder to consider a basis of opinion testimony that is not admitted for the truth of the matter asserted. Instead, it is limited to the purpose of explaining an expert's opinion. And this difficult task requires the trial court to safeguard and enforce that limited purpose testimony. The state in this case disregarded that limitation by making improper arguments. And it did so in a case that has already been reversed and remanded for a new trial for just such improper arguments. It's like a repeat. It's like a return to the movie, Back to the Future. I mean, it's Groundhog Day, maybe. The same thing happened, right? The same exact thing happened. It was in the opinion in 2016, and here we go again. That is correct. And the trial court in this case failed in its duty to safeguard the limited purpose by overruling each of Mr. Gavin's objections to the improper arguments, resulting in a denial of a fair trial for Mr. Gavin. But that's not the only errors that we have here justifying a new trial. We also have... Would that be enough in your estimation? Yes. On its own, it's clearly enough, Justice Hyman, especially because, number one, it comes after this court has already reversed for that. And number two, the arguments themselves were prejudicial enough to result in a new trial. Can I just ask, Annette, here we made it pretty clear what the ground rules were, and the state violated those ground rules. And now he has been penalized because now we're at 2024 with a new trial, and if we reverse and have another trial before a jury, how many years is that going to take? And that's because the state made this error. What's your response? Well, we also have argued in our brief that the state's evidence was unsatisfactory under the clear and convincing evidence standard, which would not require a new trial. And it's clear that the actuarial assessed risk on its own was quite low in terms of percentages, and that even though Dr. Swear said that he was considering dynamic risk factors, he said that there were five of them, but he really only identified three. He never really attempted to quantify them. The evidence presented concerning any other risk was really non-existent and unexplained in this particular case, that the evidence concerning the respondent's risk was incredibly low. Can you explain that a little? I know it's in your briefs, but this is not an easy area to get one's hands around. And since we have two attorneys that are familiar with this area, I'd just like you to go into that a little more about those numbers and about his age and so forth, how that all comes out. Sure. Each of the psychologists who testified for, well, the psychologist who testified for the state in this case was Dr. Swear. He testified that he assessed Mr. Gavin's risk to determine whether he was substantially probable to engage in acts of sexual violence, which is one of the elements to find that Mr. Gavin is still a sexually violent person. And the term substantial probability has been defined under the case law as being much more likely than not. Although we have in the past argued that that phrase should be interpreted in terms of percentages, the court has not accepted those arguments, but it has acknowledged that the percentages themselves are relevant to the question. And when I say the percentages, here's what I mean. The Dr. Swear had used the static 99R actuarial risk assessment, which is a tool that basically he scores certain items, like how many offenses has the person been convicted of? Have they ever been in a two year or longer relationship? How old are they? And they come up with a score that is then associated with certain recidivism statistics. The statistics themselves are obtained through research where basically a group that created this instrument has gotten a lot of data that followed sex offenders over time and that had each of their scores and determined how many of those individuals at any given score had been detected of a sexual offense over a certain time period. So then what we get in terms of the scores is a estimate such as that somebody has a risk score that is say 5% associated with a 5% recidivism rate over five years, or perhaps a 20% recidivism rate over 10 years. In this case, the actuarial evidence was that Mr. Gavin had a score of five and Dr. Abbott identified the recidivism rate as being 6.4% over five years. Now, Dr. Swear, he did offer a higher number than that. The number that he offered was, I beg your pardon. Well, it's okay about what he offered, Mr. Johnson. At what point is the individual no longer a sexually violent offender? At what percentage? Well, the court has not accepted a percentage. And we've argued, I think in this case, actually, in the previous decision, that it should be much more than 50% as equal. Well, let's move on from there, though. Because the trial court made a finding that he was not a sexually violent offender. And as to the issue of the qualifying mental disorder, the state argues, I'm not sure I agree with the state, but the state argues that you don't even dispute that clear and convincing evidence was presented. Well, in a way that's legally accurate because of the way that the evidence came in, we did not feel that we were able to even challenge it. And we felt that the trial court erred by restricting us from challenging the reliability and the validity of the diagnosis. So we focused our brief on arguing that the state failed to meet the third element, the substantial probability element. Because they're also arguing that you forfeited that argument because you don't argue it. So again, I'm saying I'm not sure that I agree with the state, but that's what they're saying. Well, I mean, to the extent that the mental disorder is connected to a risk of substantially probable, we certainly did not forfeit that because regardless of the mental disorder, we believe that there is no substantial probability of Mr. Gavin engaging in acts of sexual violence. And the percentages that I referenced earlier were that Dr. Swear's percentages were 12.8% over five years and 19.2% over five years for the other instrument, the STATIC-2002-R. And we would submit that on their own, those are insufficient to prove substantial probability. And so what Dr. Swear did was he tried to consider what he called dynamic risk factors and case specific factors to try and show that there was a measure of risk that was not measured by those actuarial instruments. And the testimony from the trial was completely insufficient to show that you're going to go from 12% to being substantially probable, whatever percentage that is, it's not 12%. And the fact that Dr. Swear was unable to quantify that risk, he was unable to combine them in any way. He did not even explain how those risk factors increase risk. Right. But okay, given all that though, Mr. Johnson, if we find that the trial court, if we, well, of course you guys disagree on the standard of review, but the state is arguing that this is abusive discretion standard. And if we find that the trial court did not abuse its discretion in terms of not allowing Dr. Abbott to go on to explain the basis of his finding, then we immediately get to the issue of whether or not there was clear and convincing evidence of a mental disorder. And of course you didn't argue that, where does that leave this court? Well, you can have a mental disorder and still be no longer a sexually violent person because that's only one element and the state has to prove it. Absolutely you can. And that's exactly what's going on here. So let's just take for a moment that Mr. Gavin or the respondent is no longer a sexually violent person, but if the state has proven with clear and convincing evidence that he has a mental disorder, where does that leave you? If we were to find that, we're not saying how we're finding because I don't get to make this decision alone anyway. I'm just asking you a question. I mean, the three of us has to make a decision about this. Well, I think it puts the court in a position of then concluding that he is no longer a sexually violent person because he's no longer substantially probable. And if we go back, I mean, even constitutionally speaking, there has to be both a mental disorder and a level of dangerousness to justify civil commitment. That goes back to the U.S. Supreme Court, multiple cases. I believe the FUCHA case, FUCHA versus Louisiana from 1991 or two, clearly held that you can't just prove dangerousness and you can't just prove mental disorder, that it has to be both of them in order to have a constitutional basis for civil commitment. And without the level of dangerousness, which in this case is substantially probable, he cannot continue to be civilly committed, constitutionally speaking. And under the state had to prove that he was still having a mental disorder and that he was substantially probable to engage in acts of sexual violence. So I would say from a both a statutory and a constitutional perspective, if the court concludes that there was insufficient evidence on the substantial probability, that then it would have to conclude that he is no longer a sexually violent person and that no new trial would be required. And that the court should reverse outright the decision. So Mr. Johnson, would you just tick off the basis upon which you believe the evidence is insufficient to show that he's substantially probable to commit another sex offense? Yes. The starting point with the risk assessment, at least according to the state's is the actuarial instruments and they show a recidivism risk of 12.8% to 19.2% over five years. And then this is, well, first of all, this is a change because Mr. Gavin had reached the age of 60 and he's aging out. He's aging out basically, right? Okay. What's your next point? What's your next basis? The next basis is that the percentages on their own are insufficient to meet the substantial probability as in the McCormick case. And then when we look at what was presented to try and go past that, we find that there's really no substance to anything that was presented by Dr. Swear. He identified and saying that there was five. There's two other disorders that were identified and you're saying that he didn't explain why those disorders would make him substantially probable to commit another sex offense, right? Is that your argument? Well, that's true. Yes, that's part of our argument, but he also did not identify and explain how these dynamic risk factors were increasing any risk beyond the actuarials. And so for that reason, it went completely unexplained. And the reason why it was shown on cross-examination was because he couldn't explain it. He couldn't quantify it. He could not tell the jury how much more likely Mr. Gavin was to re-offend based on these risk factors. Instead, what we know is that increasing age has by far the strongest effect at reducing risk of anything else. And this relates to the OSPD non-consent basis of the state's case, correct? Yes. Okay. Any other basis that we should know if you want to tell us about? Well, the mental disorders were tied together by the statements, but the state says Mr. Gavin could have been committed on antisocial personality disorder alone. And that's just not supported by the record in the trial. And it's also shown to be untrue based on reference to his initial commitment trial, where nobody testified that antisocial personality disorder alone was justifying his commitment. And as far as the other disorder concerning substance abuse, the only testimony was that that was going to cause more likely behaviors based on the paraphilic disorder. So the other two disorders are not a sufficient basis to have Mr. Gavin be civilly committed. It all depended upon the paraphilic disorder creating a substantial probability of acts of sexual violence, which did not occur in this case. You cite the Jason C case from, I believe the state of New York, where, and you quote that from there, in that opinion, that if this disorder, OSPD non-consent actually exists, why isn't there convincing evidence that exists outside the realm of civil confinement? Is there any evidence in this case that only time this disorder has been diagnosed as in the realm of civil confinement? I don't believe that that came into testimony during the trial, but we did introduce this as part of the pretrial. I believe we introduced these types of arguments as part of the pretrial request for a FRI hearing. And then the, interestingly, the circuit court in McDonough County, Illinois held a FRI hearing on the admissibility of the diagnosis and eventually concluded that it had no definitive diagnostic standards and heard testimony that each evaluator makes up their own criteria about what it is. You cite that case and you provided a copy of it. I read it. With that kind of background, the fact that DSM has always rejected the OSPD non-consent diagnosis, right? It's still not in the DSM, is that correct? That's correct as far as the, that's correct, yes. Okay. And the DSM is like the statute book on mental illness. Yes. And so if it's not in there, one question, and this goes to what happened downstate, is there any scientific evidence that supports the validity of OSPD non-consent? Well, we don't believe there is, and that was some of the- But did they, did they put, is there anything in the record that they put in? The state would have to show something about the validity, wouldn't they? Yes, and they did not do so. At the FRI hearing, in this case, or any? No, they simply relied upon the prior decisions. They didn't actually affirmatively defend the validity or liability or the general acceptance of the diagnosis, other than to say that previous decisions have found that it is generally accepted. And while that is true, that there have been several appellate court decisions that have said that it is generally accepted, when we look at the trial court that actually held the FRI hearing, we can see, and the trial court there said it was generally accepted, but when we look at the factual findings, they don't really support that conclusion because there's no agreed-upon criteria, then what is it that's being generally accepted? Everyone's got their own- I want to just, what you just said is, just to make sure I understand, there's no specific validated diagnostic criteria used for OCPD non-consent. Yes. And in this case, the state did, there's nothing in the record that would support a specific validated diagnostic criteria for OSPD non-consent. I agree with that, yes. In that case, where do you believe that leaves us? Well, the court could then conclude that the mental disorder, or the diagnosis, should not have been offered at the trial. And when you take that and combine that with a lack of clear and convincing evidence on the substantial probability element, it's clear that Mr. Gavin should not remain in civil commitment any longer. And we- Let me ask, let me have one more thing later. As I understand Dr. Abbott's testimony, I believe he said that OSPD non-consent is considered a poor inter-rater reliability? Yes. Okay. Can you explain for us what that means? Yes. And that way he was precluded from telling the jury, but he- Right, that was in the proffer, which was very helpful in this case. Okay. So when they measure inter-rater reliability, what they do is they take a group of many psychologists and they give them a piece of paper or multiple papers that have fact patterns on them. And they say, okay, tell us what your clinical impressions are and diagnoses. And so in this case, the case of this diagnosis, the most recent research cited by Dr. Abbott was that 82% of the time when one evaluator diagnosed OSPD non-consent, the other evaluator with the same fact pattern disagreed with the diagnosis. And that made it an incredibly poor inter-rater reliability. And it shows that there is a lack of valid criteria because if you had the actual A, B, C, D, and everyone has the same paper, everyone has the same idea of what this is. And then it also has other sections in the DSM-5 that talk about the development in the course and what other conditions are associated with it. And so you get criteria that are agreed upon by at least the people who publish the DSM. And here we've got evaluators coming up with their own conclusions on what this is and what it means. And there is no standardization at all. There's no general acceptance at all. So my question then is, if you can enlighten us, I'm trying to understand why do, in these cases throughout the country, the mental disorder is OSPD non-consent. Why isn't it paraphilia NOS, which I believe is in the in the DSM? Well, I mean, why are they going outside? Why do they have to go outside for SVP people? Why isn't why isn't the mental illness something in the DSM? Well, paraphilia NOS goes back to the DSM-4 and they changed the name. The DSM-5, they started having paraphilia versus paraphilic disorder. So the actual, there in the DSM-5 book, there's an actual description for other specified paraphilic disorder, but it's just, it's not about non-consent. It's just basically a single paragraph saying that evaluators can diagnose other conditions that are not in the book. I think the reason why they have to go outside of the DSM is because there is no generally accepted criteria and that the states evaluators who rely upon these rely upon this diagnosis for their living. And that was a crucial part of the Frye hearings that took place in New York that led to the conclusion that it was not generally accepted there, is that it was only being diagnosed by government evaluators in civil commitment cases where the people have their livelihood from testifying about that. Mr. Jessup, before I just, as Hyman tells us that we're out of time, I'd like to take you to switch gears for a moment. Give us what you believe your best argument is for us to do whatever it is that you ultimately believe this court should do in this case. What this court should do is reverse outright due to the lack of evidence as to substantial probability of offending where the state introduced low risk percentages and failed to give any substance or any opinion about how those met the definition of substantially probable or much more likely than not. And it did so in a case with presenting testimony about a diagnosis that was not generally accepted, that does not have any sort of valid criteria. And much like the obscenity identified by the trial court in McDonough County, that each evaluator knows it when they see it. And under these circumstances, given the lack of evidence and the constitutional implications of Mr. Gavin's very significant liberty interest, that the only just result here is to reverse outright. And we asked the court to do that. All right. Any other questions? We still have three minutes rebuttal. Thank you. Mr. Schiff, you'll have more time. We've been asking a lot of questions, so don't feel you are confined to 20 minutes. You may proceed. Good afternoon, your honors counsel. May it please the court. Again, my name is Assistant Attorney General Matt Skiba on behalf of the people. We'd ask this court to affirm the trial court's judgment that respondent remains an SVP. Evidence was more than sufficient. Can you begin by responding to the last answer to Justice Walker's question? You heard the answer as to why we should reverse outright. What is your response to Mr. Johnson? My response is, all of these arguments were presented in Mr. Gavin's trial. The jury heard testimony from Dr. Swear, heard competing testimony from Dr. Abbott, and the jury's verdict reflects that the jury made a credibility finding of crediting Dr. Swear over Dr. Abbott. So on appeal, my friend on the other side offers no compelling reason why this court should second guess the jury's credibility. He's not asking us to second guess the jury. He's saying that the testimony itself does not meet the standard that it needed to make in order to affirm the verdict of the jury. That is not a credibility. This isn't a credibility discussion. This is whether this is an evidentiary discussion. Well, certainly, Your Honor, but recall that in this posture, although Mr. Johnson would like this court to weigh the evidence in the light favorable to him, the exact opposite is the case. No, no, we understand that too. That's not the issue again. We're not re-weighing the evidence. We're looking at what the state's experts said. And what he did is he relies on something that is not in the DSM that he created his own judgment. He added his own judgment. And there's evidence in the record from Abbott at the, on the proffer, you know, the jury didn't hear, which is very important going to the reliability of the testimony of your expert. So, I mean, again, we're looking at the has the evidence, is it clear and convincing evidence, right? Correct, Your Honor. Okay. So that's what we're looking at. So don't, I mean, don't try to, that's where we're focused on. So we're both on the same page. Now, you agree that there is no, Mr. Johnson said there's no scientific evidence supporting the validity of OSPD non-consent. Is that true? Well, Your Honor, I mean, so- Yeah, but first yes or no, and then you can answer. So Your Honor, I mean, the trial court- No, no, no. My question is, either there is or there isn't, and then you can respond to your answer. If you could just repeat your question. My question is, is there in the record, any scientific evidence supporting the validity of OSPD non-consent? Yes, Your Honor. Okay. And tell us what that is. Well, Your Honor, so Dr. Swearer, let me take maybe a step back. But before the trial, the trial court took judicial notice under Frye of OSPD non-consent's general acceptance. That's well supported in the case law from this court and from courts around the state. Dr. Swearer also testified to the diagnostic criteria of OSPD non-consent, and then testified to the various reasons why Mr. Gavin- Let's answer my question. It had to do with validity, okay? Validity is an important aspect of these cases. My question is very specific. You're answering a broader question. I want to know whether anything in the record, scientific evidence supporting OSPD non-consent. Well, yes, Your Honor. And the limits of the OSPD non-consent were tested in both Dr. Swearer's testimony and in Dr. Abbott's testimony. And the notion- Because it's scientific evidence outside of their testimony on the validity of OSPD non-consent. Well, so Dr. Swearer's report was admitted into evidence. Dr. Abbott's competing report was admitted into evidence. And although I don't have the specific scientific bases in each expert report offhand, all of this was presented, was admitted into evidence and could have been explored by the jury. And again, the notion that Dr. Abbott- that the jury had access to that information. It's kind of still the same line that Justice Hyman has asked you questions on. But now you just simply stated that the information was- You're stating in brief that the jury has access to information. It seems like now you're stating that maybe the jury did have access to information. But it's my understanding that neither doctor's reports were ever sent to the jury. Is that correct? So I'm happy to clarify, Your Honor. So the trial court admitted each expert reports into evidence. And although my friend is correct that the jury never asked for those reports, the point is the jury could have asked for those reports if they- But the jury didn't know that. There's information in those reports the jury never was exposed to, correct? That's correct. But-  So we can't- The jury only knows what they were exposed to. The fact that the reports were entered doesn't really mean much. When it's- What was the evidence before the jury? Okay, the reports are admitted. Okay. Correct. But the jury didn't have that information. I think that's Justice Walker's question. Certainly, Your Honor. And in addition to the fact that one of the issues raised here is that Dr. Abbott was not allowed to explain the basis for his opinion. So just- So you can continue. It's the same question Justice Hyman is asking you. Certainly. Well, I'm happy to explore what Dr. Abbott was allowed to testify to and what he was not allowed to testify to. But the question is, do you agree that he was not- Mr. Johnson said at the beginning of our questioning that the problem that we discussed in our 2016 case with regard to what he could- his expert could testify to repeated itself in this case. Are you saying that that's not true or is that true? Is that with regard to the closing argument, Your Honor? No, with regard to his being able to explain his opinion. Well, Your Honor, I mean, it's important just to take a step back. The standard here is an abusive expression. I'm not taking a step back. I don't want to take a step back. I want to know, I want you to answer the question. It's a simple question. Did the state make the same error we criticized and said not to do it again in this case that was done in the case before us in 2016? That's what he said, that the state did it again. Is that true or is that not true? No, Your Honor, we certainly dispute that. Okay, so tell me on what basis you dispute that. So defendant, excuse me, respondent still, despite the trial court's limitations as to certain lines of inquiry about OSPD non-consent, respondent still had an ample opportunity to probe the weaknesses of OSPD non-consent before the jury. The only piece, the only piece that, I'm sorry, was I speaking over somebody? Apologies. The only piece that respondent was not allowed to flesh out is this question of interrelater reliability. What both Dr. Abbott and respondent was able to elicit before the jury is, as Your Honors noted, the fact that OSPD non-consent is absent from the DSM-5, that there's been failures to add a course of paraphilic disorder, that there's no measurable difference between sex offenders and non-sex offenders on sexual fantasies. And again, Dr. Abbott's bottom line conclusion that, in his words, OSPD non-consent is no longer valid. The jury heard all of this. And the offer of proof really just adds further granularity to each of those bottom line conclusions, as well as the point about interrelated reliability. And it's also important to note, with regard to the offer of the proof, is that the trial court took a look at all of the new literature since respondent's initial commitment hearing at the probable cause stage. And he took a look at this evidence and correctly observed that there's been a longstanding debate about the status of OSPD non-consent and previously PNOS. That these additional research papers that respondent cites, all they are is just additional data points in this long-running debate. There's no smoking gun in that offer of proof. So you admit that it's not generally accepted? No, Your Honor, we disagree. Because it's a running debate. I mean, if it's generally accepted, then there wouldn't be a running debate. Either it's accepted or it's not. And if there's a debate, and there is a debate, I agree, and it's been long running, and there has been a lot going on, and a lot more studies came out that apparently your expert didn't even look at because he didn't even talk about them. And he said he didn't look at it. He only looked at it prior to, I think, 2017. So yeah, I think, so you do admit that it's not generally accepted then? No, Your Honor, we certainly don't dispute that. And again, as this court has- Well, why? It's a debate. How can it be generally accepted? Try to tell me how that reconciles. Certainly. Well, and respondent explains this in his brief. The question of general acceptance is a threshold admissibility question. The legal definition of general acceptance doesn't mean that 100% of experts need to agree on this. Nobody said 100%. Nobody said 100%. But there is a tremendous debate about it. And am I correct that OSPD non-consent is rarely used outside of SVP proceedings? That's something, Your Honor, candidly, I don't know about. I don't believe that there was any evidence in this record about that either way, either at the probable cause stage, at the stage where the trial court appropriately took judicial notice of OSPD non-consent's general acceptance, or at the trial stage. Again, there was a back and forth between Dr. Swear and Dr. Abbott about the relative merits about OSPD non-consent. All of this was presented to the jury, again, with the exception of the inter-rater reliability point. The jury heard all of this and credited Dr. Swear's testimony. I understand that. Do you believe there's any ethical concerns using an unvalidated diagnostic construct like OSPD non-consent in proceedings that result in an indefinite civil commitment? No, Your Honor. I don't believe there's any ethical concerns in that regard. This is an unvalidated diagnostic test, right? It's unvalidated. You would agree? I wouldn't agree with that, Your Honor. So the literature is all wrong. Tell me where it's been validated. Well, Your Honor, again- Validated is a specific term. Well, Your Honor, the debate about OSPD non-consent has been going on for decades. And again, sometimes there's new pieces of literature supporting an OSPD non-consent diagnosis. Sometimes there's literature cutting the other way. It's also important to note, Your Honor, this is a discharge hearing. Respondent in his initial commitment hearing was found to have OSPD non-consent. So there's been- Well, let me stop you. The judge, the trial judge at the threshold found that there was probable cause that he's no longer a threat. And that's why you had an evidentiary hearing. So you say that this is an ongoing debate. Well, shouldn't the respondent then be able to put forward evidence challenging the validity and the reliability of this diagnosis? You say that he was able to, but it seems like one of the most damning pieces of evidence was the interrelator, inter- I forget what you call it, where the data show that 82% of the time, two psychiatrists or psychologists are not going to agree on this diagnosis. It seems not particularly confidence-inspiring. And so isn't this a huge problem in this case that the defendant, the respondent was not permitted to put forward evidence that the jury presumably would want to know? Well, certainly, as we discussed in our brief, this court already confronted a similar question, a similar motion on Lemonet in the Inroy Leroy Brown case. So let me stop you there. Sure. That assumes then that these diagnoses are static, that in no instance is there any dynamic effect on, or any dynamism in diagnoses in the world of psychiatry and psychology. And we know that's not the case, right? And that's why you have different DSMs over time, right? Things change. And so if there's some new evidence that's been new data, then why shouldn't the jury be able to hear that? Well, certainly, and again, I mean, I don't want to fight the hypothetical, the jury did hear about some of these studies. It may be that respondent wanted more leeway in this regard. But again, the question is, was there an abuse of discretion here? Question is, was it arbitrary, fanciful, or clearly unreasonable for the trial court to limit that testimony? I'll also note that despite respondent's attempts- So let me ask you this data showing, you know, only 82% of the time, no two professionals are going to agree on this diagnosis. I mean, it wasn't admitted. That seems arbitrary to me. I mean, that seems perfectly, I mean, I don't see how it's not relevant. Well, certainly, Your Honor. I think it's also just important to note that the question of the mental disorder element does not require the jury to find that respondent has any one particular diagnosis. The question is, does he have a mental disorder that affects his emotional or volitional capacity and predisposes him to sexual violence? So even if we set aside OSPD non-consent entirely at page 2747 of the record, of the ROP, Dr. Swearer testified that, at least in this case, ASPD, antisocial personality disorder, is a standalone SVP mental disorder. And he also testified- I thought that information was in his report. My understanding was, and I think we went over this before, it was not given to the jury, you know, that whole thing. And it was testified about, mentioned in the prior hearing, and the expert did not go down that road. So that's not what you brought up. I mean, this case is all about OSPD non-consent. Well, Your Honor, and I have the specific quote from the ROP from Dr. Swearer on hand. He said, and I quote, all three disorders are mental disorders as defined by the act. But that doesn't mean he has it. That doesn't mean he has it, or there's any evidence of it, clear and convincing evidence. No, that was not, I mean, to me, looking at the record, that wasn't what the jury was asked to look at. They were asked to look at OSPD non-consent, was it? Well, on page 2765 of the ROP, Your Honor, Dr. Swearer testified that respondent's antisocial personality disorder has led to a pretty extensive criminal history, particularly, and here's the key language, particularly in regard to his sexual offending behavior. But again, that kind of behavior, antisocial, is not a mental necessarily. A lot of people have antisocial that is not a mental illness. I mean, they have words for everything under the sun that people can have. Let's say that somebody is antisocial, and then he adds, it's really an add-on to OSPD. If you don't have OSPD, having that alone would not help, right? Well, the- That's not, he was never convicted of that. It was never, that was not involved in any prior hearing, and he didn't even, what basis does he have to say that? Well, Your Honor, if one looks at the diagnostic criteria of antisocial personality disorder, and then looks at respondents, both criminal history, his history in prison, and in TDF, I mean, certainly he has shown a flagrant disregard for the rights of others, includes two sexual assaults on the same day. We know what he's done in the past. This issue before us has nothing, we know he's done bad in the past. That is not before us. Of course, everybody in this situation has done something heinous. That's not the issue. The issue is what's going to happen in the future. Certainly. And most of the testimony by your expert was the past, looking at somebody who was 35 years old, which reminded me of something else I want to ask you. In your brief, you, and I can, I'll read the sentence. You say, respondent's history of sexual assault convictions over three decades demonstrates that he suffers from conditions that affect his emotional or volatile capacity and predispose him to sexual violence. My question to you is, where are the convictions over three decades? How do you get there? Well, so I'm happy to go through that, your honor. 1975, correct? Correct, I believe so.  Correct. 1980? Correct. 1988? Correct. Any more convictions? I think perhaps, I mean, if the, your honor's troubled by the term conviction. Well, what do you, you tell me, what is the definition of a conviction? I'm not, yes, I'm troubled, because do you know what a conviction is? Yes. Okay, tell me what a conviction is. It's a finding of guilt, either by jury or a trial court. Okay. Resulting in a judge. Was there any convictions for sexual assault after 1988? Well, your honor, there was a sexual assault. I know there was that. It was written up for that. Was there a conviction? In that case, your honor, no, there was not. Okay, so when you say that there were three decades of convictions, that's not correct. Your honor, and I apologize for the imprecise language. No, there's not an imprecise language. To me, it goes to your credibility, because you make other statements throughout here that push the envelope. But okay, you do agree now that that was not, that's not true. That was correct. Okay. But I'm happy to zoom out beyond just the convictions. Your honor's discussed the convictions already. The sexual assault of the prison teacher where it took correctional officers and inmates to pull respondents off the victim. Honestly, he hasn't been an angel, that's for sure. Absolutely. Totally agree. But, and that was in 1991. So now we are in 2023, 24, hearing and so forth, this case. 22 was the hearing, the trial. We're looking, that was 1991. Okay. So tell me, we know all that history. What the experts had to talk about are, does he have a mental illness? And it was, it is more likely than not that he was going to, he's a dangerous aside, basically. I'm happy to turn to the question of risk, which I think is what maybe perhaps your honor's gearing at. Question of whether he's still substantially probable to commit acts of sexual violence. Dr. Swearer used an adjusted actuarial approach, considered both actuarial risk and factors outside of the instrument. I think I'd start first with, I think my friend on the other side is troubled by the factors outside of the dynamic or outside of the actuarial instruments. I think he ignores the three case specific factors that are blatantly apparent from the record. Dr. Swearer cited the fact that in 3,300 evaluations, he's never seen a respondent had to be so violently pulled from his victims to such a degree that happened twice. Again, you're looking backwards. What he did in the past, we know that I don't see how that's relevant. This is a forward looking thing. The risk in the future, you keep going back to the crimes. Back in 1991 or before. Okay. Are you telling me that people can't change? Certainly people could change your honor. But the problem is the evidence in this case, the jury rejected the notion that he has changed. So I'll turn back to the question. We know that. That's why we're here. Is there clear and convincing evidence by your expert that he has not changed? What is the clear and convincing evidence? Yes, your honor. And I'm happy to go through each of the steps here. I'll start with the actuarial instruments again. So respondent, Dr. Swearer took a look at the actuarial instruments in two different ways. One is just based on the letter of the actuarial instruments. He scored an eight, which is the highest risk category. He was in the 99th percentile of risk. Dr. Swearer then acknowledged that because of his base offense, it didn't account for his advanced age. So even given a respondent, the benefit of his advanced age and that the age reduction that he would otherwise be entitled to in the static 99 and the 2002, he still scored. And I just want to be precise here. He still scored a five and a six on the static 99 and the static 2002 respectively, which is the second highest category. So on that basis, on that basis alone, that would heavily suggest that he has not changed. But then going further into consideration of protective factors, Dr. Swearer testified that even though obviously one key change here is the fact that Mr. Gavin has aged. But even considering his age, he has a history of choosing vulnerable victims. And he has a history of, at least in the instance with a hotel maid that he raped, of pretending that he had a weapon. So on that basis, Dr. Swearer testified that his age would not prevent him from being substantially probable to commit acts of sexual violence in the future. He also identified several dynamic risk factors. And again, the respondent had ample opportunity to probe any weaknesses in those dynamic risk factors during cross-examination. And again, the case-specific factors that I identified. So all of those factors collectively, the actuarial risk, the dynamic risk factors, and the case-specific factors, and the absence of protective factors, all of that supported Dr. Swearer's testimony that respondent is still substantially probable to commit acts of sexual violence. And I'll also note that- Mr. Skiba, your brief, what I took from your brief is that the fact that his crimes were committed long ago should not be controlling here because in 2019 he was involved in some incidents, which he was not charged for, as I understand it. But why don't you speak to that and help me understand how that supports the doctor's theory or opinion? Well, so Dr. Swearer identified the two incidents, I believe, in 2019 where respondent exposed himself. And Dr. Swearer opined that that was for his sexual gratification. So all of that collectively supports the notion that respondent is still sexually attracted to non-consensual sex. Dr. Swearer also testified that respondent prefers non-consensual sex to consensual sex, which- How does, if I recall the evidence, Mr. Gavin lowered his pants or his shorts to the point where you could see his pubic hairs, but not below that. So how does that go to non-consent? Well, Dr. Swearer testified that it was an instance that he did that for his sexual gratification. I believe in the other incident in 2019, Mr. Gavin also exposed himself during a cell count check, that he knew that somebody was going to be walking by his cell. This would have been at 4 a.m.? Correct, Your Honor. And again, to the extent there's any ambiguities about, A, whether respondent did that purposefully, and B, did that for a sexual gratification, respondent had ample opportunity to present that to the jury and to tease that out in cross-examination. But again, going back to the sufficiency point, the jury heard all of this, heard all of the strengths of the people's case and the weaknesses of the people's case. And the jury made the finding that he still has a qualifying mental disorder and is still substantially probable to commit acts of sexual violence. I'd like to discuss, to the extent I still have time remaining, the other discrete claims of error here. I mean, I think you're out of time, but are there any other questions? I think we've given you about a half hour. But please wrap up. Certainly, Your Honor. Again, we'd ask this court to affirm the jury's verdict that respondent remains an SVP. The evidence more than sufficed here. There was no error on the limits of cross-examination, on the jury instructions, or in closing arguments. But to the extent that any of those discrete claims of error were erroneous, any error was harmless. Because a respondent has not proven that he was harmed in any way. Thank you. Appreciate it. Thank you. Mr. Johnson. Thank you, Justice Simon. In discussing the reliability and validity, the state has completely ignored the precedent of the decision from Sandry that we cited in our brief that says reliability and validity can be tested before the jury so the jury can assess the weight of the methodology. And they have no response to that. Number two, the state claims that antisocial personality disorder at page 2747 was somehow a sufficient basis to prove the mental disorder element. It's a bald opinion. It's him saying it's a mental disorder under the act. That's the same bald opinion that was rejected as insufficient in the decision of Murray, where the expert said, yeah, that's a street gang. And it's similarly insufficient here, especially in light of everything else in terms of the past trial. Third, regarding the state, Justice Simon asked the state about whether there was any evidence in the record about the validity of OSPD non-consent. And the state suggested that that may be in Dr. Sweare's report. It's not. CI 1220 to 1221 is the relevant portion of the report, and there is simply no evidence of the validity in that section, nor was it testified to by Dr. Sweare. Instead, Dr. Sweare's report and his testimony rely completely on the generic description of paraphilia and the generic description of paraphilic disorder, not on any type of criteria that is agreed upon or found to be valid by anyone. And the reason why this is important is because of the case law that we cited from Jason C., where the court concluded that you cannot distinguish someone committing sexual offenses with a non-consent diagnosis from someone committing sexual offenses for other motivations. And that's the key fundamental problem with the state's method, is that they simply rely upon sexual offense behaviors to make a diagnosis without any sort of way to distinguish other motivations that someone might commit a sexual offense other than a paraphilic disorder. And that's where their entire diagnosis lacks scientific validity. Fourth, the state says that you should consider the fact that Mr. Gavin was in highest category of risk as proving substantial probability. That claim simply cannot stand. The substantial probability calls upon the court to assess whether he's much more likely than not to engage in acts of sexual violence. It doesn't call upon a decision of whether he's higher than average or more than somebody else. It's a question of substantial probability to engage in sexual violence or not, not about comparison to somebody else. And finally, with regard to the 2019 behaviors that are in the records, those were not sexually violent. And more importantly, the state is dependent on the truth of those matters. And that was basis of opinion testimony. The state keeps telling you that we had every opportunity to explore with the jury. Well, they had an opportunity to bring in witnesses from that 2019 incidents to say that that really happened. And they never did. They never proved that those things actually happened. And for all the reasons in our brief, as well as what we've stated here, we ask that the court reverse outright and end Mr. Gavin's civil commitment and return him to liberty. Thank you. I want to thank both of you. You both should feel good about your arguments. You were peppered with questions. You both held up very well. So I want to compliment both of you. Appreciate your briefs. And we'll take the case under advisement and be deciding it in the future weeks. So thank you very much. Have a good afternoon. And again, thank you. Thank you for your efforts this afternoon. Appreciate it. Thank you, Your Honor.